IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Ted Figueroa                              *
                                          *
                                          *
          v.                              *          Civil No. JFM-08-1805
                                          *
                                          *
Timothy Geithner                          *
Secretary, U.S. Department of Treasury    *
                                       ******

OPINION

Ted Figueroa ("Plaintiff") sued Timothy Geithner ("Defendant"), Secretary of the U.S.

Department of the Treasury ("Treasury Department"), alleging discrimination in violation of

Section 501 of the Rehabilitation Act of 1973. Defendant has filed a Motion for Summary

Judgment. For the reasons articulated below, this motion will be denied.

I.

Plaintiff is a totally blind employee of the Internal Revenue Service ("IRS"), a division of

the Treasury Department. (Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Response"), Ex. 1.) Plaintiff

has been employed by the IRS since 1994, when he was hired as a computer programmer—GS-5

IT Specialist—in the IRS's Tax Delinquent Account project (TDA). (*See id.*, Ex. 1.)

Arlene Rosh has worked for the IRS since 1976. (Mem. of Law in Supp. of Def.'s Mot.

for Summ. J. ("Def.'s Mem."), Ex. 2 at 9–10.) Ms. Rosh was a section chief in TDA from the

early 1990s until 2000, when she was promoted to Chief of the Account Services Branch. (*See

id.*, Ex. 2 at 9–15.) Robert Ragano has worked for the IRS since 1993, and has been the Director

of the Filing and Payment Compliance Division since 2006. (*Id.*, Ex. 3 at 9–11.) Mr. Ragano is

Ms. Rosh's immediate supervisor. (*Id.*, Ex. 3 at 11.) Prior to the selection at issue, Mr. Ragano had never met Plaintiff and did not know he was disabled. (*Id.*, Ex. 3 at 14, 32.)

In his original IRS hiring process, which was conducted through the Lions World School for the Blind, Plaintiff interviewed with Ms. Rosh and five or six other IRS managers (although it is unclear who made the ultimate hiring decision). Only disabled persons were interviewed for this particular programming position in TDA. (*See id.*, Ex. 1 at 19; Pl.'s Response, Ex. 1.)

Plaintiff remained a computer programmer in TDA, working in the cobalt language, until 2001. (Pl.'s Response, Ex. 1.) Until her promotion to Chief of the Account Services Branch in 2000, Ms. Rosh was Plaintiff's immediate supervisor in TDA. (*See* Def.'s Mem., Ex. 2 at 11–15; Pl.'s Response, Ex. 1.) In his first few years working in TDA, Plaintiff and Ms. Rosh had a productive and friendly relationship, and Plaintiff had no trouble getting the accommodations he needed to do his job effectively. (Def.'s Mem., Ex. 1 at 33–34.)

In 2001, Plaintiff alleges that his relationship with Ms. Rosh began to deteriorate as he became a more assertive employee. First, Plaintiff accepted various leadership positions in the Visually Impaired Employee Workforce ("VIEW"), an advocacy organization for visually impaired IRS employees. Second, Plaintiff reported the allegedly longstanding harassment of a co-worker, Randy Wakefield. Third, Plaintiff unsuccessfully sought a promotion. Fourth, Plaintiff requested an accommodation—limiting his time in front of a computer to a few hours a day by decreasing the time he spent programming and increasing the time he spent on analysis— for neck and shoulder pain caused by a car accident and the unique physical stresses on a blind programmer.[1] Fifth, Plaintiff requested an accommodation, which was granted after he filed a

---

[1] Reading Braille and typing simultaneously for long periods of time can cause neck and should pain.

formal Equal Employment Opportunity ("EEO") complaint, to convert training materials into electronic format so he could read them. (*See* Pl.'s Response, Ex. 6 at 44–64, Ex. 9 at 40–44.)

Eventually, Plaintiff left TDA to work as a computer programmer, also in the cobalt language, in the Penalty, Interest, Notice, Explanation ("PINEX") section of the IRS. Plaintiff described this work in PINEX as "95% the same as the work in TDA . . . I required no training at all and I was able to [sic] the work immediately." (*Id.*, Ex. 1.) From 2003 to 2005, while in PINEX, Plaintiff ceased working as a programmer and accepted two temporary assignments as a web site designer. Due to supervisor vacancies at the time, Ms. Rosh again directly supervised Plaintiff for parts of 2003 and 2004. (*Id.*, Ex. 1.) In 2005, Plaintiff returned to programming in PINEX, where he remained until 2008. (*Id.*, Ex. 1.) Plaintiff, describing his transition from web site designer back to computer programmer, noted that "[t]here was no need for any further training and I was able to do the work immediately, as cobalt programming was exactly the same as before and is not something you forget." (*Id.*, Ex. 1.)

Throughout his time at the IRS, Plaintiff received only excellent job performance reviews, many of which were signed and authored by Ms. Rosh.[2] (*See id.*, Ex. 11.) Plaintiff also received three performance awards. (*Id.*, Ex. 1, Ex. 9 at 81–82.) From 1994 to 2008, although Plaintiff rose in pay grade from GS-5 to GS-12, he was never promoted from the job title/code of "IT Specialist." (*See* Def.'s Mem., Ex. 1 at 34–35; Pl.'s Response, Ex. 6 at 69.)

In early 2006, Plaintiff applied for a different programming job within the IRS. (Pl.'s Response, Ex. 1.) Ms. Rosh chose Linda Squires over Plaintiff for this position. (*Id.*, Ex. 1.)

---

[2] A draft of one of Plaintiff's evaluations, authored by Ms. Rosh, apparently included some negative feedback, but it was later amended and the negative aspects were omitted at Plaintiff's request. (*See* Pl.'s Response, Ex. 6.)

Later in 2006, management internally posted[3] a job announcement for two vacancies for the position of GS-13 Lead IT Specialist in TDA, Vacancy Announcement Number 35-22-6W1-383-BT. (*Id.*, Ex. 5 at 58–60.) According to the Vacancy Announcement, both positions would be responsible for (1) "design, development, testing, documentation, implementation, and maintenance of complex computer applications" and (2) troubleshooting, diagnosing, and analyzing computer application problems and customer requirements. The Vacancy Announcement discussed the importance of computer programming, communication skills, and "leadership qualities acting as a subject matter expert." However, it did not mention past TDA experience, recent TDA experience, or past team leader experience. Although there seems to be a dispute about whether this position was a formal team leader position, Michael Long, who ended up filling one of these vacancies, stated in his deposition that it is not a team leader position and it does not include supervisory responsibilities. (Def.'s Mem., Ex. 7 at 15–16.)

Plaintiff applied to Vacancy Announcement Number 35-22-6W1-383-BT. (*See id.*, Ex. 1 at 83; Pl.'s Response, Ex. 5 at 106–28.) Among other things, Plaintiff's application described his educational background, past work experience, performance evaluations, and leadership role in VIEW. (Pl.'s Response, Ex. 5 at 110–13, 120–28.) Plaintiff expressly mentioned his past work in TDA as a programmer. (*See, e.g.*, *id.*, Ex. 5 at 113.) However, Plaintiff's application did not mention any leadership or mentoring of fellow computer programmers.

As the recommending official responsible for filling these Lead IT Specialist Vacancies, Ms. Rosh was tasked with making recommendations to Mr. Ragano, who was the selecting

---

[3] Pursuant to a collective bargaining agreement, management was permitted to announce this vacancy both internally and externally, but was required to consider internal applications first and reject them before considering external applicants. (Pl.'s Response, Ex. 9 at 97–98.) Plaintiff admits that he did not apply to the external announcement. (Pl.'s Response at 6–7 n.9 ("Plaintiff was not aware of this new opening and did not apply for the position.").) It is unclear from the record why IRS employees are able to apply through both the internal and external processes.

official. (*Id.*, Ex. 5 at 41–42.) To that end, Ms. Rosh created a three-person panel of IRS managers—Cathy Gray, Nancy Palmer, and Robert Schwartz—to evaluate the candidates and provide her with a best qualified list. (*Id.*, Ex. 5 at 52–54.) Ms. Rosh instructed the panel, two of whom were her immediate subordinates, that she was looking for someone who had team leader experience and who was currently working in TDA. (*Id.*, Ex. 9 at 54, 76–77.)

The panel created a numerical score for the applicants based on three criteria: (1) past performance evaluations, (2) critical elements of the position to be filled, and (3) awards. (*Id.*, Ex. 5 at 82–84.) On past performance evaluations, Alexander Harris and Plaintiff had equal scores of 4.6 out of 5. On critical elements of the position, Mr. Harris had a score of 5 out of 5 and Plaintiff had a score of 4 out of 5. On awards, Mr. Harris had 0 and Plaintiff had 3. Because critical elements were weighed substantially more heavily than awards, Mr. Harris edged Plaintiff 47.6 to 46.6 on overall numerical score.[4] (*Id.*, Ex. 5 at 83, 105.) Possible explanations for Mr. Harris' higher critical elements score include his more varied computer programming experience, his work instructing and mentoring less experienced programmers in the past, his formal team leader experience at the Department of Labor, as well as his clear and specific articulation of his past experience, customer service skills, and communication abilities. (*See id.*, Ex. 5 at 90, Ex. 9 at 89–90.) Furthermore, Mr. Harris had been working in TDA from April 2005 through the time of this selection process. (*Id.*, Ex. 5 at 90.)

After evaluating all the applications, the panel placed Plaintiff, Mr. Harris, and three other applicants on a best qualified list, which was forwarded to Ms. Rosh (*See id.*, Ex. 5 at 56, Ex. 8 at 53–57.) Mr. Harris and Plaintiff had the two highest scores (the third highest score was 43), and the ranking panel considered them both a "good amount" or "substantially" more

---

[4] The exact weighting and calculations that lead to this score are not material to resolution of this dispute.

qualified than the others on the best qualified list. (*See id.*, Ex. 5 at 813, 105, 130, 147, 167, Ex. 8 at 53–57.) Ms. Rosh decided to forego interviewing any of the candidates and recommended that Mr. Ragano hire Mr. Harris. (*Id.*, Ex. 9 at 75.) Ms. Rosh only recommended filling one of the two vacancies at this time, allegedly because she believed Mr. Harris was the only applicant sufficiently qualified for the job. (*Id.*, Ex. 9 at 89–94.) As her primary rationale for denying Plaintiff the second vacancy, Ms. Rosh cited Plaintiff's lack of recent experience "coding, testing, transmitting programs"; lack of recent TDA experience; and lack of experience with on-the-job-training of other programmers. (*See id.*, Ex. 9 at 89–94, 101–09.)

Mr. Ragano followed Ms. Rosh's recommendation and hired Mr. Harris as a Lead IT Specialist in TDA, effective January 15, 2007.[5] (*See id.*, Ex. 9 at 108, Ex. 5 at 19.) Mr. Ragano asked Ms. Rosh about Mr. Harris' qualifications, and Ms. Rosh explained that he had leadership and computer programming experience, as well as familiarity with TDA programs. (*Id.*, Ex. 9 at 108, Ex. 10 at 26.) However, Mr. Ragano was not aware, and apparently Ms. Rosh did not tell him, that a second vacancy remained unfilled. (*Id.*, Ex. 10 at 26–27. *But see id.*, Ex. 9 at 107–08 (Ms. Rosh in deposition: "I told [Mr. Ragano] we had announced the two at the same time.").)

Plaintiff learned he was not selected for the position on or around January 15, 2007. (*Id.*, Ex. 5 at 19.) Shortly thereafter, pursuant to IRS policy, Plaintiff asked his immediate supervisor, Mary Ellen Pritts, for an explanation of this decision. (*Id.*, Ex. 1.) Ms. Pritts informed Plaintiff that he did not receive the promotion because he lacked TDA experience. (*Id.*, Ex. 1.) When Plaintiff responded that he in fact had seven years of TDA experience, Ms. Pritts said that she would look into it and then later told him that the position required *recent* TDA experience. (*Id.*,

---

[5] Generally, when she is the recommending official, Ms. Rosh's hiring recommendations are followed. (Pl.'s Response, Ex. 9 at 35–36.)

Ex. 1 (emphasis added).)  On February 21, 2007, Plaintiff sought consultation with an EEO counselor regarding his allegations of discrimination in being "nonselected for a position as an IT Specialist GS-2210-13 (Announcement Number 35-22-6WI383BT)." (*Id.*, Ex. 5 at 19–20.)

With one of the positions for Lead IT Specialist in TDA still vacant, Ms. Rosh, unbeknownst to Plaintiff, moved to fill this second vacancy from a best qualified list developed via an external job posting. (*Id.*, Ex. 9 at 93, 105–06.) Once Ms. Rosh moved to the external list, she no longer considered applicants, such as Plaintiff, who had only applied through the internal posting. (*Id.*, Ex. 9 at 105–08.)

After conducting interviews from the external list, Ms. Rosh hired Michael Long.[6] (*See Id.*, Ex. 9 at 107.) Although Mr. Long had never worked for the IRS, he had twenty-five years of computer programming experiencing, including experience with the cobalt language. (Def.'s Mem., Ex. 7 at 10–11.) Mr. Long, in his interview, provided specific examples of mentoring and leadership experience during his career as a programmer. (*Id.*, Ex. 7 at 17–18.) However, Mr. Long had no experience as a formal team leader or supervisor. (*Id.*, Ex. 7 at 13–15.)

On May 20, 2007, Plaintiff filed an administrative complaint with the Treasury Department's EEO office alleging he was discriminated against because of his disability when he was not selected as a Lead IT Specialist per Vacancy Announcement Number 35-22-6W1-383-BT. (*See* Compl. ¶ 2; Pl.'s Response, Ex. 5 at 2, 5.) In June of 2008, a final administrative decision was issued, presumably denying Plaintiff any relief. (*See* Compl. ¶ 2.)

---

[6] There appears to be some confusion about whether Ms. Rosh was the selecting official or the recommending official for the external selection of Michael Long. (*Compare* Pl.'s Response, Ex. 9 at 34 (Ms. Rosh stating she was the selecting official), *with id.*, Ex. 9 at 107 ("I went to Mr. Ragano and said, okay, we found somebody external that we believe would be good. And [Mr. Ragano] said, okay, fine, I trust your judgment.").) Regardless, Ms. Rosh was certainly the key decision-maker. (*See id.*, Ex. 9 at 107.)

Also in 2008, Plaintiff was promoted to a GS-13 position in the Service Center Imaging Processing System ("SCRIPS"). (Def.'s Mem., Ex. 1 at 8–17.)

II.

Defendant alleges that this Court lacks jurisdiction to consider any claim of discrimination arising from the IRS's failure to promote Plaintiff to the *second* Lead IT Specialist position because Plaintiff did not apply for that position or comply with the administrative review requirements to challenge nonselection for that position. Specifically, Defendant alleges that Plaintiff failed to consult an EEO counselor about nonselection for the second position within forty-five days of the alleged discrimination and that Plaintiff's administrative complaint did not encompass nonselection for the second position.

The Rehabilitation Act prohibits federal agencies from discriminating against qualified employees based on a disability and authorizes civil actions to remedy such discrimination.[7] *See, e.g.*, *Shiver v. Chertoff*, 549 F.3d 1342, 1344 (11th Cir. 2008) ("The remedies, procedures, and rights of Title VII are available to plaintiffs filing complaints under the Rehabilitation Act"

---

[7] There is disagreement about whether suits against federal agencies alleging disability discrimination should be brought under Section 501 (§ 791) or Section 504 (§ 794) of the Rehabilitation Act. *Compare Desmond v. Mukasey*, 530 F.3d 944, 952 (D.C. Cir. 2008) (citing § 791(b) and § 791(g) for the proposition that the Rehabilitation Act authorizes "nonaffirmative action employment discrimination claims" against federal agencies), *and* § 791(b) ("Each [executive branch] department, agency, and instrumentality (including the United States Postal Service and the Postal Regulatory Commission) . . . shall . . . submit . . . an affirmative action program plan . . . . Such plan . . . shall be reviewed annually . . . [to determine if it] provides sufficient assurances, procedures and commitments to provide adequate hiring, placement, and advancement opportunities for individuals with disabilities."), *and* § 791(g) ("The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 . . . ."), *with Webster v. Henderson*, 32 Fed. App'x 36, *41 (4th Cir. 2002) (unpublished) (citing § 794(a) for the proposition that the Rehabilitation Act authorizes suits against the U.S. Postal Service), *and* § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, . . . be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service."). In my opinion, despite the Fourth Circuit suggesting otherwise in an unpublished opinion, this action was properly brought under Section 501. *See* § 791 (expressly discussing federal agencies and mentioning "a complaint alleging nonaffirmative action employment discrimination under this section"); § 794(b) (definition of "program or activity" in § 794 is limited to the operations of state/local governments, educational institutions, and private corporations or partnerships). Regardless of which section authorizes these claims, the outcome of this motion would be the same.

(citing 29 U.S.C. §§ 791, 794a(a)(1))); *Hooven-Lewis v. Caldera*, 249 F.3d 258, 268 (4th Cir.

2001) ("The standards used to determine whether an employer has discriminated under the

Rehabilitation Act are the standards applied under the Americans with Disabilities Act of 1990

("ADA") . . . . Therefore, the general rule is that no covered entity shall discriminate against a

qualified individual with a disability because of the disability." (internal citations omitted));

KENNETH W. BIEDZYNSKI ET AL., 45A AM. JUR. JOB DISCRIMINATION 2D § 72 (2009); *see also* 42

U.S.C. § 2000e-16(c) (authorizing civil actions against federal agencies for discrimination in

violation of Title VII of the Civil Rights Act).

As a prerequisite to such a suit, a federal employee must seek administrative review of

his claim and comply with various administrative procedures.[8] *See Young v. Nat'l Ctr. for Health

Serv. Research*, 828 F.2d 235, 237 (4th Cir. 1987) (analyzing Title VII claim); *Zografov v. VA

Med. Ctr.*, 779 F.2d 967, 968–69 (4th Cir. 1985) (same); *see generally Laber v. Harvey*, 438

F.3d 404, 416–24 (4th Cir. 2006) (same). "As a first step," the employee must seek consultation,

regarding the adverse employment action, with an EEO counselor within forty-five days of the

"effective date" of the alleged discrimination. *See* 29 C.F.R. § 1614.105(a)(1); *Young*, 828 F.2d

at 237 (interpreting an older version of § 1614.105(a) (§ 1614.214(a)(1)(i)) in a Title VII claim).

However, the forty-five-day time limit shall be extended "when the individual shows . . . that he

or she did not know and reasonably should not have been [sic] known that the discriminatory

matter or personnel action occurred . . . ." *See* 29 C.F.R. § 1614.105(a)(1)–(2).

---

[8] These prerequisites do not limit this Court's subject matter jurisdiction, but rather constitute the
statutory/regulatory requirements for a Plaintiff's "exhausting of administrative remedies." *See Zografov*, 779 F.2d
at 968–69. This distinction does not appear relevant in this case, with the exception that the employer bears "the
burden of proving the affirmative defense of failure to exhaust administrative remedies." *Young*, 828 F.2d at 238.

In addition to EEO counseling, a federal employee must file a timely administrative complaint with the employer-agency—and the agency generally must take final action on that complaint—challenging the adverse employment action. *See* 29 C.F.R. 1614.106(a); *Young*, 828, F.2d at 237 (citing an older version of § 1614.106 (§ 1613.214(a)(1)(ii))). Although the scope of the subsequent civil suit is constrained by the allegations in the administrative complaint, "[a]n administrative charge of discrimination does not strictly limit [the civil suit]; rather the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the [administrative] charge of discrimination." *Lane v. Wal-Mart Stores East, Inc.*, 69 F. Supp. 2d 749, 755–56 (D. Md. 1999) (quoting *Chisholm v. United States Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981)); *Chisholm*, 665 F.2d at 491 (in a Title VII action, where administrative complaint had only challenged promotion and detailing, holding that plaintiff could bring claims of discrimination in discipline and testing because "allegation . . . that USPS discriminated in promotions sufficed to put USPS on notice that the entire promotion system was being challenged, including . . . discipline and testing" (internal citations omitted)); *cf.* § 1614.106(c) ("A complaint must contain a signed statement from the person claiming to be aggrieved or that person's attorney. This statement must be sufficiently precise to identify the aggrieved individual and the agency and to describe generally the action(s) or practice(s) that form the basis of the complaint."); *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247–48 (4th Cir. 2000) ("If a plaintiff's claims . . . are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation, the plaintiff may advance such claims in her subsequent civil suit [against a private employer].").

Plaintiff met all the procedural hurdles necessary to file a civil suit challenging his nonselection for both Lead IT Specialist vacancies. First, Plaintiff applied and was rejected for

*this second position*. TDA announced *two* Lead IT Specialist vacancies per Vacancy Announcement Number 35-22-6W1-383-BT and Plaintiff applied to that announcement. The selection of Mr. Harris and nonselection of Plaintiff, though part of one hiring process, included two distinct decisions: choosing Mr. Harris over Plaintiff for one vacancy and passing over Plaintiff for the second vacancy. *Cf. Hux v. City of Newport News*, 451 F.3d 311, 316 (4th Cir. 2006) (in a Title VII action, discussing plaintiff's nonselection for one of six promotional vacancies as one hiring "process" but evaluating the plaintiff's qualifications against those of each of the six promoted employees). Plaintiff's failure to apply to the external announcement or directly compete with the ultimate recipient of the second position does not change this fact.

Second, Plaintiff satisfied the forty-five-day time limit for seeking EEO counseling by contacting an EEO counselor, regarding his nonselection for both Lead IT Specialist positions, on February 21, 2007. If January 15, 2007 was the "effective date" of the discrimination against Plaintiff, as suggested in the EEO counselor report, then Plaintiff sought EEO counseling within forty-five days of the discrimination. If January 15, 2007 was merely when Plaintiff became aware of his allegedly discriminatory nonselection, then the EEO was required to extend the forty-five day window. Either way, Defendant has not met its burden of proving that Plaintiff failed to comply with this procedural requirement. *Cf. Shiver*, 549 F.3d at 1344 ("[Plaintiff] contacted an EEO counselor within 45 days of . . . the date that he learned that his demotion had become effective. Thus, . . . his administrative complaint was timely . . . .").

Finally, Plaintiff properly pursued an administrative complaint challenging nonselection in a manner that permits him to challenge nonselection for both positions in this civil action. In expressly claiming discrimination in nonselection for Lead IT Specialist per Vacancy Announcement Number 35-22-6W1-383-BT, Plaintiff's administrative complaint appears to

cover his nonselection for both Lead IT Specialist vacancies advertised under that announcement number. (*See, e.g.*, Pl.'s Response, Ex. 5 at 2, 9, 29–33.) Even if the administrative complaint only challenged the decision to hire Mr. Harris over Plaintiff,[9] nonselection for the second opening was still within "the scope of the administrative investigation that [could] reasonably be expected to follow" because selecting Mr. Harris for the first position and nonselecting Plaintiff for the second position were part of the same decisionmaking process. The positions were advertised in the same announcement, a single best qualified list was compiled for both positions by the same panel using the same metrics, and recommendations for both decisions were made by Ms. Rosh. Any reasonable investigation of the decision to hire Mr. Harris over Plaintiff would, and in fact did, also reveal facts supporting a claim of discrimination in Plaintiff's nonselection for the second vacancy.[10] Any complaint referencing Vacancy Announcement Number 35-22-6W1-383-BT certainly put Defendant on notice that Plaintiff may challenge all employment decisions made pursuant to that announcement, including the decision not to fill the second position.

---

[9] Apparently, Plaintiff's administrative complaint was interpreted as *not* challenging nonselection for the second position. "[The EEO office] state[d] in a footnote, 'The IF does not indicate why only one (1) selection was made. During the supplemental investigation, Complainant, in the presence of his representative (attorney), stated that he intended only the selection of Alexander Harris be investigated. (IF, Ex. 4, p 39-2) We assume, then, that Complainant was not contesting the Agency's decision not to fill the second advertised vacancy.'" (Pl.'s Response at 17 (purporting to quote EEO office's closing report).) I credit Plaintiff's characterization of this finding because it is uncontested by Defendant and contrary to Plaintiff's interests. However, I am skeptical of this interpretation of Plaintiff's administrative complaint. I am unable to find on page 39 of the Investigative File (Exhibit 4) any statement by Plaintiff expressly disclaiming a challenge to nonselection for the second position, and Plaintiff's complaint's citation to Vacancy Announcement Number 35-22-6W1-383-BT is significant evidence to the contrary. (*See, e.g.*, Pl.'s Response, Ex. 5 at 2, 9, 29.)

[10] Furthermore, any failure to expressly challenge nonselection for the second position may have been caused by one of the very reasons that a civil action should not be strictly limited by the allegations in the administrative complaint: opacity in management decisionmaking can leave an employee ignorant about the circumstances of an adverse employment decision until after an administrative investigation has been completed. In this case, Plaintiff had no idea what happened to the second vacancy; he only knew that Mr. Harris had been selected for one of the Lead IT Specialist positions. (*See* Pl.'s Response, Ex. 5 at 33.) Despite the announcement of two such vacancies, as far as the Plaintiff knew the IRS decided to only fill one of the positions (for whatever reason).

III.

Because Plaintiff raises a genuine issue about whether the non-discriminatory reasons offered by Defendant for the failure to promote Plaintiff were a pretext to mask intentional discrimination, Defendant's Motion to for Summary Judgment will be denied.

A.

In the absence of direct or circumstantial evidence of a discriminatory purpose,[11] Rehabilitation Act claims are analyzed under the framework, originally formulated for Title VII claims, announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Kersey v. Washington Metro. Area Transit Auth.*, 586 F.3d 13, 16 n.1 (D.C. Cir. 2009) (internal citations omitted); *Rios-Jimenez v. Principi*, 520 F.3d 31, 40–41 n.6 (1st Cir. 2008) (internal citations omitted); *Ennis v. Nat'l Ass'n of Bus. and Educ. Radio, Inc.*, 53 F.3d 55, 57–58 (4th Cir. 1995).

To survive summary judgment under *McDonnell Douglas*, the plaintiff must first "prove a *prima facie* case of discrimination by a preponderance of the evidence." *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 959–60 (4th Cir. 1996) (internal citations omitted). If the plaintiff does so, the burden shifts to the defendant to offer a "legitimate, non-discriminatory reason for its employment action." *Id.* at 959; *accord Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). Finally, if the defendant presents such a reason, the burden shifts back to the plaintiff to raise a genuine issue as to whether the proffered explanation was a pretext

---

[11] At least in Title VII cases, "a plaintiff may avert summary judgment and establish a claim for intentional sex or age discrimination through two avenues of proof": (1) the *McDonnell Douglas* framework or (2) "by demonstrating through direct or circumstantial evidence that . . . discrimination motivated the employer's adverse employment decision." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284–85 (4th Cir. 2004). In addition to satisfying *McDonnell Douglas*, Plaintiff seems to argue that he may proceed under the direct evidence avenue. I do not analyze this argument because Plaintiff's claim survives under *McDonnell Douglas*. *See infra*.

for unlawful discrimination. *See Desmond*, 530 F.3d at 962; *Hux*, 451 F.3d at 315; *Evans*, 80 F.3d at 959.

Because Defendant in this case does not contest Plaintiff's ability to establish a *prima facie* case,[12] summary judgment hinges on whether (1) Defendant offered a legitimate, non-discriminatory reason for not promoting Plaintiff and, if so, (2) whether Plaintiff has offered evidence to raise a genuine issue about whether that reason was pretextual.

### B.

Defendant has presented legitimate, non-discriminatory reasons for the adverse employment discrimination. The defendant's burden here is one of production, not persuasion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Holland*, 487 F.3d at 214. "Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision." *Evans*, F.3d at 960.

Defendant has met its burden of production by presenting proposed testimony that Plaintiff was denied this promotion for the following reasons: (1) lack of recent programming

---

[12] Proving a *prima facie* case is a "relatively easy" burden. *Evans*, 80 F.3d at 959–60 (Title VII case). In failure to promote cases, it requires the Plaintiff to prove "that [1] she applied for an available position [2] for which she was qualified, but [3] was rejected [4] under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (Title VII case). In *McDonnell Douglas* itself, the Court described a form of the *prima facie* case in terms particularly relevant to this action: "(i) that [the plaintiff] belongs to a racial minority; (ii) that [the plaintiff] applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, [the plaintiff] was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of [the plaintiff's] qualifications." *McDonnell Douglas*, 411 U.S. at 802 (Title VII case).

Some courts, however, describe the *prima facie* case of disability discrimination under the Rehabilitation Act as the Fourth Circuit seems to have described it in *Brockman v. Snow*: "To make a prima facie case of disability discrimination, [plaintiff] must prove that: (1) she has a disability under the RA; (2) she is qualified for the employment in question; and (3) she suffered an adverse employment action due to discrimination on the basis of disability." 217 Fed. App'x 201, *208 (4th Cir. 2007). In my opinion, this is not an accurate description of the *McDonnell Douglas prima facie* test. If a plaintiff shows "an adverse employment action due to discrimination on the basis of disability," then the plaintiff would have already established unlawful discrimination, and the second and third steps of *McDonnell Douglas*—proffering legitimate reasons and determining pretext—would be irrelevant. Further, *Brockman* cites *Doe v. Univ. of Med Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir. 1995) to support this description, but page 1265 in *Doe* does not appear to describe the *prima facie* case under *McDonnell Douglas*. Even Defendant in this case describes the *prima facie* case as more lax than the Fourth Circuit did in *Brockman*. (Def.'s Mem. at 14.) Regardless, I need not resolve this confusion because Defendant does not challenge Plaintiff's ability to prove the elements of this *prima facie* case.

experience, (2) lack of recent TDA experience, (3) a lower application score than Mr. Harris,[13] and (4) lack of programming-related leadership and/or mentoring experience. All four of these explanations concern either job performance or relative employee qualifications and are therefore, if true, valid, nondiscriminatory bases.

C.

Plaintiff in this case has raised a genuine issue as to whether Defendant's explanations were a pretext for unlawful discrimination, and summary judgment is therefore inappropriate.

To establish pretext, a plaintiff must present evidence to allow a reasonable juror to find that (1) the legitimate, nondiscriminatory reasons were "unworthy of credence" and (2) unlawful discrimination was the actual motive for the decision. *See Reeves*, 530 U.S. at 143, 147; *Desmond*, 530 F.3d at 962; *Holland*, 487 F.3d at 218.

i.     <u>Falsity of the Proffered Reasons</u>

Plaintiff may prove that the defendant's proffered reasons were unworthy of credence "by showing that [they] had no basis in fact, [they] did not in fact motivate the discharge, or, if they were factors in the decision, they were jointly insufficient to motivate the discharge." *Maddox v. Univ. of Tenn.*, 62 F.3d 843, 849 (6th Cir. 1995).

I have little trouble concluding that Plaintiff has presented sufficient evidence for a reasonable juror to find that all four of Defendant's proffered reasons were either factually false or did not in fact motivate nonselection. First, Plaintiff points to evidence contradicting the assertion that he lacked recent programming experience. Plaintiff's own affidavit alleges that, although he worked for a couple years in a non-programming capacity as a web site designer, he returned to programming in PINEX in 2005, where his work was "95% the same" as his

---

[13] Even though, as explained below, the mere fact that Mr. Harris scored higher than Plaintiff is immaterial to Plaintiff's nonselection for the second position, Defendant nonetheless cites it as a rationale for Plaintiff's nonselection.

programming in TDA. (Pl.'s Response, Ex. 1.) Although Defendant disputes this characterization, resolving the differing views of Plaintiff's work is best left to the fact finder.

Second, plaintiff points out that his lack of recent TDA experience, though factually true, could not have been the actual reason for his nonselection: Mr. Long lacked *any* TDA experience but was nonetheless hired as a Lead IT Specialist. Further, the internal vacancy announcement did not even mention TDA experience as a qualification for the position.[14] (*Id.*, Ex. 5 at 58–60.)

Third, the significance of Plaintiff's lack of programming-related leadership experience is belied by Mr. Long's lack of team leader experience. Although the interview may have drawn out Mr. Long's past informal mentoring and training work, Mr. Long's testimony that this Lead IT Specialist position is not a team leader position, and the fact that the vacancy announcement did not do more than merely mention general subject matter leadership experience, also suggest that experience instructing programmers was not as critical to this position as Defendant suggests. (*See* Def.'s Mem., Ex. 7 at 15–16; Pl's Response, Ex. 5 at 58–60.)

Finally, the slightly higher score given to Mr. Harris may explain why Mr. Harris was chosen over Plaintiff, but it does not explain why Plaintiff was not selected for the second position. In fact, considering how close the two scores were, Plaintiff's score, if anything, increases suspicion that he was denied the second position for improper reasons.

ii.    Discriminatory Motive

Although a plaintiff must prove that the adverse employment decision was motivated by discrimination, proof that the proffered reasons were false may serve as circumstantial evidence of such discrimination. *Reeves*, 530 U.S at 147. This inference is based on "the general principle

---

[14] Plaintiff may have been more qualified than Mr. Long, considering Defendant's emphasis on the importance of TDA experience. *See Evans*, 80 F.3d at 960 (noting that, in light of the two prongs of falsity and intentional discrimination, in failure to promote cases the plaintiff generally must prove "that she was the better qualified candidate for the position").

of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt" and the fact that "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation." *Id.* The probative value of falsity varies depending on whether there are alternative non-discriminatory (but non-proffered) explanations and the strength of the evidence establishing falsity. *Id.* at 148. In some cases, falsity coupled with the evidence establishing the plaintiff's *prima facie* case will suffice to support a finding of unlawful discrimination. *Id.* Factors to consider in determining whether intentional discrimination could be found relying heavily on falsity and the *prima facie* case "include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case . . . ." *Id.* at 148–49, 151–54.

Plaintiff in this case has raised a genuine question as to whether the nonselection was motivated by unlawful discrimination. First, the falsity of Defendant's proffered reasons is probative of intentional discrimination; it suggests dishonesty on the part of Ms. Rosh,[15] from

---

[15] Even if Ms. Rosh was the only person at the IRS with a discriminatory motive, Plaintiff's action may still proceed. At least in Age Discrimination in Employment Act ("ADEA") and Title VII cases, even where the official decisionmaker lacks a discriminatory motive, an employer may still be liable if "one of [the plaintiff's] superiors in the chain of authority[] was motivated by [discriminatory] animus and was *principally responsible* for [the adverse employment decision]." *Hill*, 354 F.3d at 288 (emphasis in original) (internal marks omitted) (quoting *Reeves*, 530 U.S. at 151 (ADEA case)). Additionally, an employer may be liable for the decision of an employee who lacks official decisionmaking powers if that employee is the "actual decisionmaker." *Id.* at 288–89 (quoting *Reeves*, 530 U.S. at 151–52). These rules are in part derived from agency principles, which are implicated because the definition of "employer" in both Title VII and the ADEA includes "any agent" of the employer. *Id.* at 286–87. Furthermore, construing the statutes to only allow liability for the actions of formal decisionmakers "would thwart the very purpose of [Title VII and the ADEA] by allowing employers to insulate themselves from liability simply by hiding behind the blind approvals, albeit non-biased, of formal decisionmakers." *Id.* at 290.

Although the Rehabilitation Act does not expressly implicate agency principles, prohibiting liability for anything other than the actions of official decisionmakers would thwart the purpose of the Rehabilitation Act just the same as it thwarts the purpose of Title VII and the ADEA. Moreover, I see no reason why the Rehabilitation Act would create a more burdensome standard, in comparison with Title VII or the ADEA, for holding a federal agency liable for the discriminatory actions of an employee. I therefore hold that the test announced in *Hill* and *Reeves* applies to claims of discrimination under the Rehabilitation Act.

Even assuming that Mr. Ragano was the official decisionmaker in this case and lacked any discriminatory motive, Plaintiff has presented evidence that Ms. Rosh was one of Plaintiff's superiors and was "principally responsible" for the failure to promote Plaintiff. Additionally, evidence that Ms. Rosh's promotion

which a jury might infer she "is dissembling to cover up a discriminatory purpose." *See id.* at 147–48. Further, the evidence that the proffered reasons were unworthy of credence is strong. To be sure, two alternative (that is, non-proffered), non-discriminatory explanations for nonselection come to mind: Ms. Rosh's personal animosity toward Plaintiff and/or retaliation for Plaintiff's EEO activity. (If the former explained nonselection, Plaintiff would not have any Rehabilitation Act claim; if the latter explained nonselection, it would not support the specific claim Plaintiff alleges in this case.) However, there is little direct evidence that Ms. Rosh actually acted out of a retaliatory motive or personal animosity. Moreover, if personal animosity or retaliation motivated Ms. Rosh, she hid those motivations in her deposition testimony, and I am reluctant to give Defendant a benefit from Ms. Rosh's lack of candor.[16] *Cf. id.* at 147 ("[T]he employer is in the best position to put forth the actual reason for its decision.").

Second, evidence that goes to Plaintiff's *prima facie* case also supports a discriminatory motive. More specifically, the circumstances that give rise to an inference of discrimination— Ms. Rosh recommended Mr. Harris (non-disabled) over a blind applicant for one of two identical vacancies, Ms. Rosh refused to recommend the blind applicant for the other vacancy, and the blind applicant's nonselection resulted in keeping the position open for months—are particularly probative of discriminatory intent in this case: Not only was a qualified disabled applicant passed over in favor of non-disabled applicant, but the disabled applicant had a nearly identical application score to that of the non-disabled applicant. Accordingly, the aggregation of the evidence that establishes Plaintiff's *prima facie* case and the evidence that Defendant's proffered

---

recommendations were always followed suggests she may have also been the "actual decisionmaker." Thus, Plaintiff need only offer evidence of Ms. Rosh's discriminatory motive to survive summary judgment.

[16] This is not to say, however, that alternative explanations will never help support summary judgment. On the contrary, *Reeves* makes clear that alternative non-discriminatory explanations, even those not proffered by the defendant, may be probative of a lack of discriminatory motives.

reasons were unworthy of credence raises a genuine issue as to whether Plaintiff's nonselection was the result of unlawful discrimination.

This discussion is not to suggest that a fact finder *must or should* conclude that discrimination motivated the nonselection. In fact, there is some evidence weighing against a discriminatory motive. However, where there is substantial evidence that the proffered reasons are unworthy of credence and the facts establishing the *prima facie* case are particularly probative of discriminatory intent, determining whether unlawful discrimination has occurred is best left to the fact finder at trial.

DATE: May 10, 2010

_____/s/_____
J. Frederick Motz
United States District Judge